*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 07a0316p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

　　　　　　　*Plaintiff-Appellee,*

　　*v.*

KERRY WATSON,

　　　　　　　*Defendant-Appellant.*

No. 06-6021

>

---

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
No. 05-00126—James H. Jarvis, District Judge.

Argued: July 24, 2007

Decided and Filed: August 15, 2007

Before: COLE and GILMAN, Circuit Judges; MARBLEY, District Judge.[*]

---

**COUNSEL**

**ARGUED:** Kim A. Tollison, FEDERAL DEFENDER SERVICES, Knoxville, Tennessee, for Appellant. Tracee J. Plowell, ASSISTANT UNITED STATES ATTORNEY, Knoxville, Tennessee, for Appellee. **ON BRIEF:** Kim A. Tollison, FEDERAL DEFENDER SERVICES, Knoxville, Tennessee, for Appellant. Tracee J. Plowell, ASSISTANT UNITED STATES ATTORNEY, Knoxville, Tennessee, for Appellee.

---

**OPINION**

---

　　　R. GUY COLE, JR., Circuit Judge. Defendant-Appellant Kerry Watson appeals a district court order denying his motion to suppress evidence after he conditionally pleaded guilty to possession with intent to distribute crack cocaine and being a felon in possession of a firearm. On appeal, Watson challenges the district court's denial of his motion to suppress, arguing that police officers conducted an illegal search when they searched a residence not specifically authorized by the search warrant, and, accordingly, all fruits obtained incident to that search should be suppressed. Because we hold that the good-faith exception to the exclusionary rule applies, we **AFFIRM**.

---

[*] The Honorable Algenon L. Marbley, United States District Judge for the Southern District of Ohio, sitting by designation.

1

## I. BACKGROUND

Based on four controlled drug purchases by a confidential informant at a suspected crack house located at 828 West Emerald Avenue (the "residence"), Knoxville police officer Jeff Holmes prepared an affidavit for a warrant, drafted a warrant, and applied for a warrant to search the residence and four individuals believed to be occupying it, one being Watson. On March 31, 2005, a Knox County judicial commissioner issued a warrant, and, the next day, several officers, with Officer Holmes leading the team, executed the warrant.

When officers arrived at the residence, Watson was present. The officers found $1494 in his trouser pockets. A search of the residence recovered approximately eighteen grams of crack cocaine, two grams of marijuana, a stolen handgun, and as assorted drug-selling paraphernalia. When officers discovered the handgun, which was hidden underneath a sofa cushion, Watson spontaneously stated that it was his. The officers then *Mirandized* Watson, and he made a written statement admitting to possession of the handgun and the crack cocaine.

After unsuccessfully challenging, via a motion to suppress, the constitutionality of the officers' search of the residence, Watson conditionally pleaded guilty to (1) possession with intent to distribute crack cocaine, in violation of 21 U.S.C. § 841(a)(1), and (2) being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1), retaining the right to appeal the district court's suppression ruling. The district court sentenced Watson to 120 months' imprisonment. Watson appealed.

## II. ANALYSIS

On appeal, Watson challenges only the district court's denial of his motion to suppress, contending that the warrant was plainly defective. Both the four-page warrant, and the incorporated affidavit supporting the warrant, comprehensively described the residence as well as the four individuals to be searched. Moreover, maps of the area, a tax-assessment printout, and photographs of the residence were all attached to the warrant. The warrant, however, listed only the four individuals in its grant-of-authority section and inexplicably omitted the residence. Therefore, argues Watson, all evidence recovered from the residence, and the fruits that followed, should have been suppressed. Additionally, Watson contends that the good-faith exception to the exclusionary rule is inapposite because the warrant was so facially deficient that no officer could reasonably have believed that it authorized a search of the residence. On appeal, the Government readily concedes that the warrant's grant-of-authority section failed to list the residence, but maintains that this omission did not render the warrant defective and, in any event, the good-faith exception applies.

In reviewing a district court's denial of a motion to suppress evidence, this Court reviews the district court's findings of fact for clear error, and its legal conclusions de novo. *United States v. Gillis,* 358 F.3d 386, 390 (6th Cir. 2004). "The evidence must be viewed in the light most likely to support the district court's decision." *United States v. Sanford*, 476 F.3d 391, 394 (6th Cir. 2007) (citation and internal quotation marks omitted).

We proceed assuming, without deciding, that the warrant's omission of the residence from the grant-of-authority section rendered the warrant invalid as to a search of the residence, and "turn immediately to consider the application of the *Leon* good faith exception." *United States v. Ware*, 338 F.3d 476, 481–82 (6th Cir. 2003) (citing *United States v. Leon*, 468 U.S. 897, 925 (1984) ("[C]ourts [may] reject suppression motions posing no important Fourth Amendment questions by turning immediately to a consideration of the officers' good faith.")). Because we hold that the good-faith exception applies, we need not determine whether the warrant was invalid.

**A. Good-Faith Exception**

The Supreme Court has recognized an exception to the exclusionary rule where "the officer conducting the search acted in objectively reasonable reliance on a warrant issued by a detached and neutral magistrate that subsequently is determined to be invalid . . . ." *Massachusetts v. Sheppard*, 468 U.S. 981, 987–88 (1984) (citing *Leon*, 468 U.S. at 922–23). The Supreme Court has explained that no additional deterrent effect will be achieved through the exclusion from evidence of the fruits of that search, where an officer's reliance on a warrant is objectively reasonable. *See Leon*, 468 U.S. at 922. Of course, the good-faith exception is a judicially created remedy, "subject to judicial modification based on social utility analysis," *United States v. Rice*, 478 F.3d 704, 712 (6th Cir. 2007), and premised on the idea that "the exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates." *Leon*, 468 U.S. at 898.

As *Leon* emphasized, however, there are instances where exclusion is required even when an officer obtains a warrant and abides by its terms. *Id*. at 922. That is, suppression remains the appropriate remedy when an officer lacks "reasonable grounds for believing the warrant was properly issued." *Id*. This encompasses at least four situations, *Rice*, 478 F.3d at 711–12 (citing *Leon*, 468 U.S. at 923), only one of which is relevant to this case: "where the officer's reliance on the warrant was not in good faith or objectively reasonable, such as where the warrant is facially deficient." *Id*. Watson argues that, because the warrant failed to expressly authorize a search of the residence (a point the Government concedes), the warrant was therefore facially deficient as to a search of that residence. Accordingly, says Watson, the officers could not reasonably have believed the warrant authorized them to search the residence, and thus the officers' reliance on the warrant was not in good faith. We disagree.

This case presents a factual scenario similar to that in *Groh v. Ramirez*, 540 U.S. 551 (2004), where the Supreme Court held that the good-faith exception did not entitle officers to qualified immunity after conducting a search based on a defective warrant. There, ATF Agent Groh prepared an affidavit, a warrant application, and a warrant form to search for various weapons that officers suspected were stored at a ranch. *Id*. at 554–55. After the warrant's execution, in which Agent Groh led the team, it was discovered that, because of a clerical error by Agent Groh, the warrant, in the section calling for a description of the *items* to be seized, instead described the *place* to be searched. *Id*. The warrant did not incorporate any other documents by reference and therefore "did not describe the items to be seized *at all*," rendering the warrant "so obviously deficient" that the Court regarded the search as "warrantless." *Id*. at 558. The Court went on to explain that "even a cursory reading of the warrant in this case—perhaps just a simple glance—would have revealed a glaring deficiency that any reasonable police officer would have known was constitutionally fatal." *Id*. at 564. Because the warrant was "so facially deficient" that the executing officers could not reasonably have presumed it to be valid, the good-faith exception was inapplicable. *Id*. at 565 (citing *Leon*, 468 U.S. at 923).

This analysis of the good-faith exception in the qualified immunity context similarly applies to the suppression context presented here. *See Malley v. Briggs*, 475 U.S. 335, 344 (1986) ("[W]e hold that the same standard of objective reasonableness that we applied in the context of a suppression hearing in *Leon* . . . defines the qualified immunity accorded an officer whose request for a warrant allegedly caused an unconstitutional arrest."). As discussed below, however, the facts here—in contrast to those in *Groh*—justify application of the good-faith exception.

As mentioned, Officer Holmes prepared the affidavit for the warrant, drafted the warrant, applied for the warrant, and led the team that executed the warrant. Testimony from the suppression hearing indicates that, at all times, both he and the issuing judicial commissioner believed that the warrant authorized a search of the residence. As we know, however, Officer Holmes omitted the residence from the warrant's grant-of-authority section. The judicial commissioner apparently failed

to notice this oversight and signed the warrant as drafted. So far, the facts are similar in all relevant respects to *Groh*. The question then is whether the warrant here was "so facially deficient . . . that the executing officers [could] not reasonably [have] presume[d] it to be valid." *Groh*, 540 U.S. at 565 (quoting *Leon*, 468 U.S. at 923). We hold that the warrant was not so deficient.

The error in *Groh* was far more conspicuous than here. In *Groh*, "even a cursory reading of the warrant . . . —perhaps just a simple glance—would have revealed a glaring deficiency that any reasonable police officer would have known was constitutionally fatal." *Id*. at 564. Here, on the other hand, the omission was virtually unnoticeable. The warrant's introductory paragraph put a reasonable officer on notice that the warrant was issued for the purpose of searching a premises, stating that "THE FACTS SET FORTH IN [THE] AFFIDAVIT SHOW AND CONSTITUTE PROBABLE CAUSE . . . THAT THE LAWS OF THE STATE OF TENNESSEE HAVE BEEN AND ARE BEING VIOLATED ON OR IN A (PREMISES) . . . ." The warrant went on to describe the residence in painstaking detail—listing, among other things, (1) its location; (2) its general size, shape, and orientation; and (3) the color of its exterior walls and trim, roof, shutters, garage door, and even mailbox. The warrant then listed and described the four individuals to be searched along with the items to be seized. Although the Government concedes that the warrant's grant-of-authority section listed only these four individuals, that section did refer to the residence: "YOU . . . [ARE] HEREBY COMMANDED . . . TO FORTHWITH SEARCH [THE FOUR INDIVIDUALS] . . . FOR THE [ITEMS] SPECIFIED, AND IF . . . ANY PART THEREOF SHALL BE FOUND IN *SAID PREMISES* THEN YOU ARE AUTHORIZED AND COMMANDED TO SEIZE THE [ITEMS] . . . ." (emphasis added). Although we agree with Watson that the warrant was not a model of clarity, we nonetheless cannot say that warrant was "so facially deficient . . . that the executing officers [could] not reasonably [have] presume[d] it to" authorize a search of the residence. *Id*. at 565 (quoting *Leon*, 468 U.S. at 923).

The omission of the residence from the grant-of-authority section was apparently the result of a clerical error. This is evident because the warrant thoroughly described the residence, and the warrant's affidavit and incorporated documents—maps of the area, a tax-assessment printout, and photographs of the residence—make clear, that the warrant's purpose was to, among other things, authorize a search of the residence. A "simple glance" by Officer Holmes, or any reasonable officer executing the warrant, would likely not have revealed any deficiency. *Groh*, 540 U.S. at 564; *see also Ware,* 338 F.3d at 482 (explaining that warrants are to be read "not hypertechnically," but in a "commonsense fashion"). Moreover, all evidence suggests that the judicial commissioner was entirely "aware of the scope of the search he was authorizing," *Baranski v. Fifteen Unknown Agents of Bureau of Alcohol, Tobacco & Firearms*, 452 F.3d 433, 440 (6th Cir. 2006) (en banc) (quoting *Groh*, 540 U.S. at 561 n.4), and that search included the residence. We therefore conclude that, based on the warrant, the officers reasonably believed that they had authority to search the residence.

We are mindful that "[i]t is incumbent on the officer executing a search warrant to ensure the search is lawfully authorized and lawfully conducted." *Groh*, 540 U.S. at 563. This burden is even greater when the officer executing the warrant prepares the affidavit in support of the warrant, drafts the warrant, and applies for the warrant. *See id*. at 564 ("Moreover, because petitioner himself prepared the invalid warrant, he may not argue that he reasonably relied on the Magistrate's assurance that the warrant contained an adequate description of the things to be seized and was therefore valid."). Nonetheless, *Groh* does not impose a strict proofreading requirement upon an officer obtaining a search warrant, but rather a duty to ensure that the warrant conforms to constitutional requirements. *Id*. at 563 n.6; *cf. id*. at 579 (Thomas, J. dissenting) ("The Court today points to no cases directing an officer to proofread a warrant after it has been passed on by a neutral magistrate, where the officer is already fully aware of the scope of the intended search and the magistrate gives no reason to believe that he has authorized anything other than the requested search."). Here, the parties do not dispute that (1) a warrant was issued by a neutral and detached magistrate, (2) based upon probable cause, (3) supported by "Oath or affirmation," (4) that

particularly described the place or person to be searched and the things to be seized. *See* U.S. Const. amend. IV. The affidavit made clear that Officer Holmes intended to obtain a warrant to search the residence, and by all accounts the judicial commissioner believed that he was supporting such a warrant. Thus, the officer's failure to notice a minor deviation in the warrant from what was sought in the affidavit or application does not evince an absence of good faith. *See, e.g.*, *Ware*, 338 F.3d at 482–83 (holding that good-faith exception applied where affiant officer executed warrant and reasonably believed he had received an anticipatory warrant but through clerical error it authorized only an "immediate search"); *United States v. Berry*, 113 F.3d 121, 124 (8th Cir. 1997) (holding that good-faith exception applied where affiant officer had executed warrant and reasonably believed it authorized a search of general areas although through clerical error it authorized a search for more limited area).

Finally, we note that suppression here would not further the purpose of the exclusionary rule—deterring police misconduct. *Leon*, 468 U.S. at 918. Courts must proceed cautiously whenever an error, no matter how seemingly insignificant, appears within the four corners of a warrant. *See, e.g.*, *United States v. Reilly*, 76 F.3d 1271, 1280 (2d Cir. 1996) ("Good faith is not a magic lamp for police officers to rub whenever they find themselves in trouble."). In a case such as this, however, where the error is one that can be characterized as a minor, unintentional drafting oversight; the error is unapparent by even a close read, let alone "a simple glance"; and the error goes unnoticed by the officer who applied for the warrant, the judicial commissioner who issued the warrant, and the officers who executed the warrant, we cannot conclude that this is one of "those unusual cases in which exclusion will further the purposes of the exclusionary rule." *Leon*, 468 U.S. at 918; *accord United States v. Peltier*, 422 U.S. 531, 539 (1975) ("Where the official action was pursued in complete good faith, however, the deterrence rationale loses much of its force.").

## III. CONCLUSION

For these reasons, we **AFFIRM**.